# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| CARPENTERS DISTRICT COUNCIL<br>OF KANSAS CITY PENSION FUND, | )<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| vs. | ) | No. 06-0109-CV-W-FJG |
| JNL Construction Co., Inc., et al., | )<br>)<br>) | |
| Defendants. | ) | |

## ORDER

Trustees for the Carpenters District Council of Kansas City Pension Fund, Carpenters District Council of Kansas City and Vicinity Welfare Fund, and Carpenters District Council of Kansas City and Vicinity Apprenticeship and Training Fund (collectively "the Funds") brought an action under section 502, see 29 U.S.C. § 1132 (civil enforcement), and section 515, see 29 U.S.C. § 1145 (delinquent contributions), of the Employment Retirement Security Income Act (ERISA).  The Funds sued JNL Construction Company (JNL), Larry McAllister, Nancy McAllister and TVM Rentals, Inc. (TVM) to recover unpaid fringe benefits.

The Funds alleged Defendants failed to contribute union employees' fringe benefits from November 2003 through January 2005, as required by the collective bargaining agreements.  The Funds seek to pierce the corporate veil of JNL to reach Larry and Nancy McAllister, and TVM.  The Court now makes the following Findings of Fact and Conclusions of Law.

## I. BACKGROUND

1. On August 31, 1995, Defendant Nancy McAllister signed a Stipulation on behalf of JNL to the collective bargaining agreement then in effect between the Builders Association of Missouri, The United Brotherhood for Carpenters and Joiners of America, and District Council of Kansas City and Vicinity, AFL-CIO.

2. The collective bargaining agreement to which JNL stipulated was effective on April 1, 1995, and subsequent collective bargaining agreements remained in effect during the time period of November 1, 2003, to January 26, 2005.

3. JNL did not terminate its stipulation to the subject collective bargaining agreement after execution of the Stipulation.

4. Carpenter employees of JNL were employed under the terms of the subject collective bargaining agreement, under the terms of which Defendant JNL agreed, among other things, to pay and contribute to Plaintiff Funds various sums per hour for each carpenter employee covered by and subject to said agreement.

5. At various times, Nancy and Larry McAllister each owned from 49-51% of JNL. Larry primarily worked as a carpenter, superintendent, or job bidder.

6. In approximately 1998, Defendants Larry McAllister and Nancy McAllister divorced.

## II. AUDIT AND CONTRIBUTIONS TO FUNDS

7. The Fund Administrator's records showed that JNL became delinquent in its required employee benefit plan contributions to the Plaintiff Funds during November 1, 2003, through January 26, 2005. (Tr. 88:18-21, 89:3-10). Under the

collective bargaining agreement, the Funds were authorized to collect liquidated damages and interest for amounts due. (Ex. 8).[1]

8. Nancy McAllister, on behalf of JNL, advised the Trustees that JNL was aware of the delinquency and intended to return to good standing. (Tr. 110:8-16).

9. The Construction Benefits Audit Corporation (CBAC) regularly performs employer payroll contribution audits to ensure that the proper payroll contributions are made to employee benefit plans such as the Plaintiff Funds.

10. The Plaintiff Trustees requested CBAC to conduct a field audit of JNL for the period of November 1, 2003, through January 31, 2005.

11. CBAC reviewed JNL's payroll records to compare the number of hours worked by JNL's carpenter employees to the number of hours reported and paid to the Plaintiff Funds on behalf of JNL's carpenter employees. (Ex. 13).

12. CBAC's audit determined that employee benefit plan contributions due and owing to the Plaintiff Funds by Defendant JNL during the audit period were under-reported and/or underpaid. (Ex. 12, 13).

13. The Contributions Worksheet is a summary of JNL's delinquent contributions, identified monthly, during the audit period. (Ex. 13).

14. According the Contributions Worksheet, JNL paid $70,078.17 during the audit period, and had a balance due to the Funds of $151,401.24 (Ex. 13). According to Defendants, which base their calculations on copies of checks that JNL wrote to the Plaintiff Funds, JNL paid Plaintiffs $185,793.76, during the period of November 1, 2003, through January 26, 2005. (Def. Ex. 30B). The Court notes,

---

[1] All exhibits refer to Plaintiffs' exhibits, unless otherwise indicated.

however, that Defendants' total amount includes payments made during the audit period for contributions JNL owed prior to November 1, 2003.

### III. CASH FLOW PROBLEMS

15. Prior to October 2004, Nancy McAllister owned 51 percent of JNL's stock, and Larry McAllister owned approximately 49 percent of JNL's stock.

16. Around October 2004, Nancy McAllister became the owner of 100 percent of JNL's shares of stock and President of JNL. No purchase took place, and no value changed hands because the stock had no value at the time.

17. From November 1, 2003 through January 31, 2005, JNL paid nothing to Nancy McAllister.

18. From November 1, 2003 through January 31, 2005, JNL paid Larry McAllister a total of $42,961.74 in payroll and expense reimbursements. (Def. Ex. 30A).

19. JNL was a subcontractor for Walton Construction, for a KCI construction project. Due to JNL's financial straits, JNL agreed with Walton that Walton's draw requests, instead of being paid to JNL, would be paid directly to the Funds. (Tr. 130:1-13). When asked whether JNL was getting paid anything on the KCI job, Nancy McAllister explained all of the money was being jointly paid to the Funds. She added "[JNL] didn't take draws anymore." (Tr. 131:2-8). Nancy McAllister advised the Fund Administrator of JNL's arrangement with Walton. (Tr. 131:25, 132:1-12). The Fund Administrator did not object to the arrangement. (Tr. 132:10-12). JNL's arrangement shows earnest efforts to continue operating and making contributions to the Funds.

4

20. JNL retained Benjamin Kasey to pursue accounts receivables.

21. JNL was unable to collect key accounts receivables, including $148,992.49 from the Window Factory, $37,052 from D.M. Ward, $42,885.01 from the Weitz Company, $13,580.00 from Key Construction, and $10,056.40 from R.L. Phillips and Duhnke Millwork. (Tr. 3, p. 2:15-24, pp. 3-5, 6:1-11).

22. The Window Factory was the largest account receivable, for which JNL sought $223,992.49 for unpaid invoices, extra work, and the interest that had accrued. (Tr. 3 p. 5:2-10). The matter settled for $75,000, with which JNL paid $50,000 to satisfy a consent judgment with Weitz Company. Mr. Kasey testified the remainder of the Window Factory proceeds was used to pay JNL's outstanding bills and legal fees. (Tr. 3 p. 5:23-25, 6:1-4).

## IV. **PLEASANT HILL RESIDENCE**

23. Prior to July 29, 2004, JNL owned a residential property located at 32101 158th Street, Pleasant Hill, Missouri (the "subject residence"). JNL had an office in, operated out of, and stored its equipment at the subject residence.

24. Larry McAllister used about $60,000 of his own money in the purchase and construction of the subject residence.

25. On or about July 26, 2004, Larry McAllister personally borrowed $462,000.00 from Fieldstone Mortgage Company using the subject residence as security. (Ex. 21). Larry McAllister personally received $217,740.10 in cash from the loan.

26. On July 29, 2004, Larry McAllister purchased the subject residence from JNL by Warranty Deed in consideration of $10 plus Larry McAllister's agreement to pay the construction loan of approximately $250,000.

27. Nancy McAllister and Larry McAllister lived at the subject residence after the July 29, 2004 purchase.

28. JNL continued to operate out of the subject residence after the July 29, 2004, purchase. JNL paid no rent to Larry McAllister.

29. On July 30, 2004, Larry McAllister deposited $217.720.10 into his personal checking account.

30. Larry McAllister paid $95,000 to JNL in the form of checks dated July 9, 2004, August 19, 2004, and September 13, 2004. (Ex. 17). Thus, the sale of the subject residence infused capital into JNL.

31. Larry McAllister refinanced the subject residence on December 3, 2004, and borrowed $588,000.00, using the subject residence as security.

32. As part of the December 3, 2004, loan, Mr. McAllister satisfied a lien against the subject residence in the amount of $474,517.12.

33. As part of the December 3, 2004, loan, Mr. McAllister personally received $86,053.08 in cash. On or about December 9, 2004, Larry McAllister deposited $86,053.08 into JNL's checking account with First National Bank of Missouri.

34. In June 2005, Larry McAllister sold the subject residence for $800,000, and realized a profit of about $184,000. Court records show all but around $49,000 was owed to a lender.

35. The Court finds this refinancing transaction thus benefitted JNL's creditors. Because Plaintiff Funds received a check from JNL dated December 13, 2004, in the amount of $22,374.51, the Funds were among those creditors who benefitted from this transaction.

## V. SALE OF TOOLS TO TVM

36. On or about August 23, 2004, JNL sold all of its tools and equipment to Defendant TVM Rentals, LLC (TVM) for $100,000.

37. TVM did not make any payment to JNL for the tools and equipment.

38. Instead, Larry McAllister, TVM's owner, paid $100,000 from his personal funds to the Internal Revenue Service to satisfy tax debts owed by JNL.

39. TVM's only client was JNL.

40. JNL did not pay any fees to TVM for rental and/or use of TVM's tools and equipment for JNL's operations.

41. Despite not being paid for renting equipment and/or tools to JNL, TVM never pursued a claim for amounts owed to TVM by JNL. Larry McAllister testified that TVM did not have the financial ability to hire an attorney to pursue the collections. (Tr. 2, 16:1-10).

42. Because the tools were later sold at an auction for about $20,000, TVM agreed to pay much more than these tools were worth.

## VI. CONCLUSIONS OF LAW

43. In the Eighth Circuit, "corporate officers cannot be held personally liable under ERISA where there is no basis for piercing the corporate veil." Rockney v. Blohorn, 877 F.2d 637, 643 (8th Cir. 1989); See also Pipe Fitters Health and Welfare

Trust v. Waldo, R., Inc., 969 F.2d 718, 720-21 (8th Cir. 1992), cert. denied, 506 U.S. 1054 (1993).

44.     To pierce the corporate veil under the Eighth Circuit and Missouri alter ego doctrine, the corporate entity must be used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud.  Greater Kansas City Laborers Pension Fund v. Superior General Contractors, Inc., 104 F.3d 1050, 1056 (8th Cir. 1997); Bank of Belton v. Bogar Farms, Inc., 154 S.W.3d 518, 520 (Mo. Ct. App. 2005).

45.     Greater Kansas City Laborers Pension Fund v. Superior General Contractors, Inc., 104 F.3d 1050, 1055 (8th Cir. 1997), held that traditional corporate law is used to determine alter ego liability.  Although the Greater Kansas City Laborers case did not specify proximate causation as an element of alter ego liability, proximate causation is an element of traditional alter ego liability.  William Meade Fletcher, 1 Fletcher Cyclopedia of the Law of Corporations § 41.10 (2008) (in discussing the alter ego or mere instrumentality test, the third element necessary to pierce the corporate veil is proximate causation).

46.     Similarly, traditional Missouri corporate law has long required proximate causation to pierce the corporate veil or to establish alter ego liability.  66, Inc.,  998 S.W.2d at 40-41 (in a case brought against two individuals who formed a joint venture, which joint venture was the sole owner of a shell corporation, the two individuals exercised such control over the shell corporation that they were alter egos of the shell corporation); Edward D. Gevers Heating & Air Conditioning Co. v. R. Webbe Corp., 885 S.W. 2d 771, 773-74 (Mo. Ct. App. 1994) (alter ego and

piercing the corporate veil claims brought against a corporation's sole officers, directors, and shareholders; proximate causation requirement is implicit in the test).

47. The seminal case in Missouri, Collet v. Am. Nat'l Stores, Inc., 708 S.W.2d 273, 275 (Mo. Ct. App. 1986), involved claims brought against a shell corporation's parent corporation as well as the shell corporation's sister corporation. Although corporate law generally respects the separate legal identities of two corporations, one corporation can be the alter ego of another. Id. at 283-84. The test to analyze the alter ego question requires proximate causation as its third and final element. Id. at 284.

48. The causation issue was recently addressed by the Missouri Court of Appeals in Bank of Belton v. Bogar Farms, Inc., 154 S.W.3d 518 (Mo. Ct. App. 2005). The Court held that creditors such as Plaintiffs must prove that Larry McAllister, Nancy McAllister, and TVM Rentals "exercised such control and domination over [JNL Construction] as to cause the insolvency." Here, as in Bank of Belton, Plaintiffs argued that several transactions depleted available assets and left JNL undercapitalized. Similarly, there is no causal connection between the challenged transactions and the cash-flow problems of JNL. "Regardless of whether the facts show an alter ego relationship, there is no evidence to indicate [Plaintiffs were] injured as a result of any financial transactions." Id. at 521.

49. The totality of the evidence does not depict a situation in which JNL, Larry or Nancy McAllister, or TVM, were being used to perpetrate wrongful conduct to cause injury to the Plaintiff Funds.

50. Plaintiffs' evidence that JNL made several payments to Larry McAllister in the form of checks with the "Memo" line left blank, during the audit period of November 1, 2003 to January 31, 2005, do not necessarily support a finding that Defendants sought to strip JNL of assets. (Ex. 19). Without additional evidence, the Court cannot infer that Larry McAllister was furthering wrongful conduct by receiving payments from JNL.

51. The delinquent contributions ended in January 2005. Any transaction the Defendants engaged in after January 2005, including sale of the subject residence in June 2005, cannot be the proximate cause of delinquent contributions to the Funds during the audit period.

52. The Court also rejects Plaintiffs' argument that Larry McAllister's purchase of the subject residence in July 2004 caused injury to the Funds. Larry McAllister's purchase of the subject residence from JNL was, indeed, conducted at less than arm's length. Yet Larry McAllister's use of the $217.740.10 that he received from the loan suggests he sought to improve JNL's financial situation. Larry McAllister paid JNL $95,000 to keep the company operating. The Plaintiff Funds subsequently received regular contributions. (Ex. 19; Def. Ex. 30B). In addition, Larry McAllister satisfied JNL's debt in the amount of $100,000 to the IRS in August 2004.

53. Regarding the transaction with TVM Rentals, the tools were transferred for $100,000.00. A payment of $100,000.00 was made to the IRS for payment of JNL's tax debts. The tools, however, had a value of only $20,000.00. This transaction ultimately benefitted JNL's creditors, and was not the proximate cause of Plaintiffs' injuries.

54. In addition, JNL used office space in Larry McAllister's residence and duplex, rent free. This benefited JNL's creditors, and did not harm them. In addition, during the time period at issue, JNL paid Plaintiffs $164,333.55, and permitted draws on the KCI project to be paid directly to Plaintiffs. During this same time period, Mr. McAllister was paid less than his weekly salary and Ms. McAllister was paid nothing.

55. JNL, and its creditors, benefitted from Mr. McAllister's payments toward the premises where JNL conducted business, his payment of JNL's taxes, his deposits of refinancing proceeds into JNL's account, and his decision to draw a reduced salary during the time period in question. <u>Carpenters District Council of Kansas City Pension Fund, et al., v. JNL Construction Co., Inc.</u>, 596 F.3d 491, 496 (8th Cir. Feb. 25, 2010).

56. With regard to Plaintiffs' claims against Larry McAllister, Nancy McAllister, and TVM, the Court finds in favor of those Defendants on all of Plaintiffs' claims.

57. With regard to Plaintiffs' claims against JNL, the Court finds in favor of Plaintiffs. The parties are directed to confer within the next 14 days regarding Plaintiffs' damages against JNL only. If the parties are not able to reach agreement by **May 2, 2011**, Plaintiffs are directed to contact the Court to schedule a brief hearing on Plaintiffs' damages against JNL only.

**IT IS SO ORDERED.**

Date:  04/18/11                                           **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                             Fernando J. Gaitan, Jr.
                                                                Chief United States District Judge